3 F.3d 1445
 Darrell Gene DEVIER, Sr., Petitioner-Appellee, Cross-Appellant,
v.
Walter ZANT, Warden, Georgia Diagnostic and Classification
Center, Respondent-Appellant, Cross-Appellee.
Darrell Gene DEVIER, Sr., Petitioner-Appellant,
v.
Walter ZANT, Warden, Georgia Diagnostic and Classification
Center, Respondent-Appellee.
 Nos. 89-8628, 90-8571.
 United States Court of Appeals,
Eleventh Circuit.
 Sept. 23, 1993.
 
 Dennis Dunn, Paula K. Smith, Asst. Attys. Gen., Atlanta, GA, for appellant.
 Daniel I. Prywes, Pepper, Hamilton & Sheetz, Washington, DC, Arnold P. Peter, Los Angeles, CA, for appellee.
 Appeals from the United States District Court for the Northern District of Georgia.
 Before KRAVITCH and COX, Circuit Judges, and CLARK, Senior Circuit Judge.
 PER CURIAM:
 
 
 1
 Petitioner Darrell Gene Devier, Sr. brought a petition for a writ of habeas corpus under 28 U.S.C. Sec. 2254 seeking collateral relief from his convictions and sentence of death in Georgia state court for the murder and rape of Mary Frances Stoner. The district court granted the petition on the grounds that Devier had been unconstitutionally prejudiced by the introduction at his sentencing hearing of testimony concerning an unrelated, prior criminal offense that he allegedly committed, but for which he has neither been charged nor convicted. The State appeals from the district court's order, and Devier brings a cross-appeal from the denial of the other claims contained in his petition. We reverse the district court's grant of relief as to sentencing and affirm the district court's denial of Devier's other claims.
 
 I.
 
 2
 At the time of her murder, Mary Frances was twelve years old and lived with her parents in Bartow County. Devier was employed as a member of a tree-trimming crew and was sent in November, 1979 to prune trees near the Stoner residence. The crew completed its work around noon on Friday, November 30, 1979 and received the remainder of the day off. Several witnesses observed Devier at approximately 3:45 p.m. seated in a dark-colored Ford Pinto that was parked at a truck stop located 150 feet from the Stoner's driveway. A school bus dropped off Mary Frances near her driveway between 3:55 and 4:00 p.m. Another student, who exited at the next stop about 50 yards away, observed the Pinto backing out of the Stoner driveway with two people in it.
 
 
 3
 Mary Frances' body was found on the morning of December 1 by hunters in a wooded area in Floyd County. Her head was crushed and blood-tinged frothy material exuded from her mouth and nose. Several large blood-stained rocks were found near her body. During the autopsy, the Bartow County medical examiner found fresh tears and bruises in the vaginal area and a large amount of blood-tinged fluid inside the vagina containing sperm. The doctor testified that, in his opinion, Mary Frances had been raped and died shortly afterwards as a result of a severe brain injury and asphyxiation by choking.
 
 
 4
 After being the subject of a police investigation for several days, Devier was arrested on December 6 and gave a taped statement after signing a waiver of his rights. He told the police officers that he had been driving his black Pinto the afternoon of November 30 when he saw Mary Frances step down from the school bus. After the bus left, Devier pulled into the driveway to ask for directions, grabbed her, and drove to an isolated, wooded area. He stopped the car and raped Mary Frances in the back seat. After she was forced out of the car, Devier told the officers that he intended to tie her to a tree. Mary Frances, however, began yelling and hit him in the chest. Devier pushed her to the ground where she hit her head "on a rock or something" and when he saw that, he "just got down and started choking her." He then left the scene.
 
 
 5
 After his first trial ended in a mistrial due to improper contact between a bailiff and a juror, Devier was subsequently convicted by a Floyd County jury for the rape and murder of Mary Frances and sentenced to death on both counts. The Supreme Court of Georgia reversed this conviction on the grounds that the grand jury list was not fairly representative of a cross-section of the citizens of Floyd County.[1] After a reindictment and a third trial in November, 1983, Devier was again found guilty of both offenses and sentenced to death. The Georgia Supreme Court affirmed the convictions and sentence on direct appeal,[2] and the United States Supreme Court denied Devier's petition for a writ of certiorari.[3] Devier then sought habeas corpus relief in state court, which was denied on the merits after an evidentiary hearing. The Georgia Supreme Court denied a certificate of probable cause to appeal, and the United States Supreme Court denied review.[4]
 
 
 6
 Devier brought the instant petition for a writ of habeas corpus in the district court.[5] After denying Devier's motions for discovery and an evidentiary hearing, the district court issued its final order in which it held that the testimony at the sentencing hearing concerning a prior rape allegedly committed by Devier violated the constitutional requirement that nonstatutory aggravating information must be "reasonably objective and reliable." The court denied the remaining claims in Devier's petition and ordered the State to resentence him. After hearing argument on the appeal from this order, we remanded this case for the limited purpose of deciding a sentencing issue that had not been resolved by the district court in its final order. This court retained jurisdiction, and we now proceed to a review of the claims raised in Devier's petition. We find that the district court erred in holding that evidence of unadjudicated crimes, as a class, can never be introduced at a capital sentencing hearing. In Part II.G. of this opinion, we will discuss specifically the admissibility of the evidence of unadjudicated crimes presented in this case.
 
 II.
 A. Ineffective Assistance of Counsel
 
 7
 Devier initially claims that his trial counsel failed to render effective assistance of counsel in violation of the Sixth Amendment at numerous points during both the guilt and penalty phases of his trial. To establish such a claim, a defendant must show that his counsel's representation fell below an "objective standard of reasonableness" and "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."[6] In applying this constitutional standard, a reviewing court must strive to avoid the "distorting effects of hindsight" by viewing the circumstances of a trial through the eyes of counsel.[7] In particular, a court should be highly deferential to those choices made by defense counsel in the conduct of a trial that are arguably dictated by a reasonable trial strategy. The Sixth Amendment's guarantee of effective assistance of counsel is satisfied if counsel's choice of defense tactics was the result of an informed, professional judgment made after a reasonable investigation into the facts of a case and the relevant law.[8]
 
 
 8
 At his third trial in November, 1983, Devier was represented by two attorneys, Scott Callan and Albert Burkhalter, who were appointed to represent him approximately six months prior to trial. The state court, which held an evidentiary hearing on Devier's habeas petition, found that "Callan had considerable criminal trial experience, including one case where the death penalty was sought," and that "Burkhalter had tried several felony cases and had previously assisted in a death penalty case." Because their client had been previously tried and convicted, Callan and Burkhalter were in the unusual position of knowing the exact details of the State's case and what defense tactics used by Devier's previous attorneys had failed. At the state habeas proceeding, Callan and Burkhalter testified that after reviewing the transcript of the second trial and consulting with the first set of attorneys, they concluded that a "confrontational" approach to Devier's defense had been unsuccessful at the second trial. In light of the strong likelihood that Devier would be convicted for a second time, the attorneys adopted a "low key" approach at the third trial to avoid appearing antagonistic to the jury and with the primary emphasis of avoiding the death penalty.
 
 1. Guilt-Innocence Phase
 
 9
 Against this general background, we now turn to Devier's specific claims of ineffective assistance of counsel raised on appeal. Devier first alleges that his attorneys failed to present any evidence at the guilt phase challenging the voluntariness of either his waiver of rights during his post-arrest interrogation or the resulting inculpatory statements. In particular, Devier claims that his attorneys should have called witnesses attacking the voluntariness of this confession in light of the circumstances of his actual interrogation and his below average intelligence.[9] We find, however, that Devier has failed to allege how and in what manner his own incriminating statements should have been attacked at trial by his attorneys. The district court found that the attorneys reviewed the transcript of the prior trial and consulted with Devier on a number of occasions about his defense. At these meetings, Devier was not able to divulge any additional facts or information that should have caused a reasonable attorney to conduct further investigations into the nature of Devier's confession. Devier also has not made even the barest allegation as to what additional witnesses should have been called on his behalf at trial, and we are therefore unable to assess what effect, if any, this omission might have had on the outcome of the trial.
 
 
 10
 In addition, the failure of his attorneys to introduce psychological evidence as to how his general mental status affected the voluntariness of his confession does not amount to ineffective assistance of counsel. The record does not show, and Devier does not allege, that a reasonable attorney should have been on notice that a psychological examination of Devier was needed to assess his competency to stand trial or was otherwise necessary in the conduct of his defense.[10] Even if such information had been available, we cannot say that the failure to present such evidence to attack the voluntariness of his confession was sufficiently prejudicial as to have affected the outcome of his trial.
 
 
 11
 Devier next contends that his attorneys should have objected to the prosecutor's inflammatory tactics during the guilt phase of the trial such as the use of photographs of the victim, the dropping of heavy rocks during his closing argument, and his invocation to the jury that they should "agree with me" as to defendant's guilt. The attorneys testified at the state habeas proceeding that the prosecutor's closing argument was similar to the one previously given at the first trial and that they made a strategic decision not to object to it as part of their "low-key" approach. We find nothing in the record to suggest that this decision was ill-advised. Yet, even if this tactical decision not to object was unreasonable, Devier was not prejudiced by such an omission because we find that the prosecutor's remarks at the guilt phase were not so improper as to have rendered Devier's trial fundamentally unfair.[11] In addition, photographs of the victim of a crime are admissible under Georgia law[12] and therefore no claim for ineffective assistance of counsel can lie from the failure to object to such evidence.
 
 
 12
 Devier also alleges that his attorneys failed to explore or develop a defense at the guilt phase based on his impaired mental state at the time of the crime resulting from the use of marijuana. Although review of this claim may be precluded because it does not seem to have been raised initially in the district court, we nevertheless conclude that the argument is meritless. The district court specifically found that the attorneys made a reasonable, tactical decision that Devier would not testify because he had made a negative impression at his earlier trial by projecting himself in a "fairly sneering[,] arrogant manner." Devier, however, does not allege how he could have established an intoxication defense at trial without his own testimony. We therefore have no basis for concluding that his attorneys' failure to develop this line of defense at the guilt phase amounted to ineffective assistance of counsel.[13]
 
 
 13
 Lastly, Devier claims that his defense counsel's closing argument at the guilt phase was deficient because he failed to ask the jury to return a verdict of not guilty and asked only that they judge the evidence "fairly and impartially." Although there is serious doubt as to whether counsel's failure to deliver a more "adversarial" closing argument was sufficiently prejudicial as to affect the outcome of the case, we decline to review the merits of this contention because it was clearly not presented in the petitions addressed to either the district court or the state court.[14]
 
 2. Sentencing Phase
 
 14
 Devier contends that his attorneys were ineffective in their representation of him during the sentencing phase due to their inadequate preparation, failure to call other available witnesses willing to testify on his behalf, and failure to elicit mitigating evidence of Devier's abusive and disrupted childhood and upbringing. The record shows that the attorneys called five mitigating witnesses--Devier's brother, two uncles, an aunt, and his mother--who each generally testified that he had been a good child and that he was a nonviolent and pleasant adult. There is no basis in the record on which to conclude that the district court erred in finding that Devier's attorneys adequately prepared these witnesses by consulting with them regarding their role as mitigating witnesses. In addition, Devier has not carried his burden of showing how the testimony of these witnesses would have changed if they had been better prepared. Similarly, Devier's counsel did not act unreasonably in failing to call other witnesses whose testimony was proffered by affidavit in the district court. These additional witnesses would have testified to essentially the same impressions and sentiments about Devier that his close relatives had already related at trial and would have added little to the weight of the mitigating evidence.
 
 
 15
 We find somewhat more troubling the fact that the attorneys failed to present as mitigating evidence any testimony concerning Devier's disrupted childhood and the effects that an abusive father had on his early family life. In the state habeas proceeding, the attorneys testified that evidence of Devier's troubled childhood was presented at his second trial by his mother, Thelma Woods. At the third trial, however, Woods became extremely emotional on the witness stand and was unable to complete her testimony. As a result of this breakdown, the jury was prevented from hearing any testimony concerning Devier's childhood. Prior to calling her down from the witness stand, the attorneys stated that they made a tactical decision that Woods' emotional state "probably got across [her concern for her son] about as well as anything could." In addition, the district court found that the attorneys were well aware of Devier's family history because such evidence had been presented at his second trial. Given the fact that Devier had received a sentence of death, the court concluded that the attorneys made a reasonable strategic decision to try a different approach in not presenting such mitigating evidence.
 
 
 16
 Although there is no per se rule that evidence of a criminal defendant's troubled childhood must always be presented as mitigating evidence in the penalty phase of a capital case, it is undoubtedly true that such evidence will usually present a defendant in a more sympathetic light to the jury. In this case, however, such evidence had already been presented to a jury without apparent success at Devier's second trial. Thus, in light of their overall "low-key" strategy at trial and the breakdown of Devier's mother on the witness stand, the attorneys made a tactical decision not to present any testimony of Devier's family history. In considering claims of ineffective assistance of counsel, we are reminded that a reviewing court should "address not what is prudent or appropriate, but only what is constitutionally compelled."[15] In this case, Devier's attorneys had "a reasonable basis for [their] strategic decision that an explanation of petitioner's history would not have minimized the risk of the death penalty."[16] Whether or not we believe this trial strategy afforded Devier the best possible defense at the penalty phase is beside the point; the decision not to present such mitigating evidence was reasonably supported, fell well within "the wide range of professionally competent assistance,"[17] and is therefore entitled to deference by this court.[18]
 
 
 17
 Devier also contends that his counsel rendered ineffective assistance of counsel at the sentencing phase by failing to object to the prosecutor's allegedly inflammatory closing argument. In these remarks, the district court noted that:
 
 
 18
 the prosecutor compared the jurors to soldiers who had an unpleasant duty to perform and argued that their failure to fulfill this duty would result in the loss of their birthright in the same manner as the Cherokee Indians lost their birthright in Georgia. The district attorney also argued that [Devier] was like a cancer which should be exorcised to protect society. As well, the prosecutor remarked that life imprisonment would constitute a pleasant retirement for [Devier] with the full use of expensive recreational facilities.
 
 
 19
 At the state evidentiary hearing, the attorneys testified that the prosecutor's argument was generally the same argument presented at the second trial and that they made a strategic decision not to object on the belief that the trial court would not require the prosecutor to rein in his remarks. As noted above, the attorneys adopted an overall strategy of conducting a "low-key" defense in order to avoid appearing antagonistic at trial. Although we agree with the district court that the prosecutor's arguments approached the bounds of an unconstitutional effort to enflame the jury,[19] the decision not to object was based on a reasonable strategic choice. The fact that such a stratagem, viewed from hindsight, may have been imprudent does not, however, provide the basis for a claim of ineffective assistance of counsel.
 
 
 20
 Finally, Devier alleges that his defense counsel was deficient in making a closing argument at the penalty phase that did not mention any of the mitigating evidence or address the crucial aggravating testimony of the prior rape allegedly committed by Devier and which consisted solely of a plea for mercy. We find this contention meritless. The fact that defense counsel chose to place primary emphasis on eliciting sympathy from the jury for his client, rather than thoroughly dissecting the evidence presented in the penalty phase is a uniquely tactical decision that a reviewing court must treat with deference. In this case, we find nothing in the record to suggest that defense counsel's closing argument at the sentencing hearing was grossly deficient in presenting an adequate argument to the jury to impose a lesser punishment. Furthermore, Devier does not allege, and we cannot discern from the record, any prejudice that he may have suffered from not having a closing argument that examined the evidence in more detail.[20]
 
 B. Procedural Default
 
 21
 The state court found a number of the claims in Devier's habeas petition to be procedurally defaulted on the grounds that he had not properly preserved them for collateral review. Specifically, the state court found that Devier failed to raise an objection at trial as to these various claims or to bring these issues on direct appeal. These contentions are (1) that Devier was unconstitutionally prejudiced by the introduction of numerous photographs of the victim; (2) that Devier was unconstitutionally prejudiced by the use of armed guards to escort him to the courtroom and their proximity to him at trial; (3) that the closing arguments of the prosecutor at both the guilt and penalty phases were an unconstitutional attempt to inflame the jury; (4) that the Georgia Unified Appeal Procedure deprived Devier of the right to counsel; (5) that Devier's right to a fair trial was violated by the trial court's failure to provide funds for the employment of an investigator and other expert witnesses; (6) that the "death qualification" of the jury deprived Devier of a fair and impartial jury; (7) that the "death qualification" of the jury deprived Devier of a representative cross-section of the community; and (8) that Devier was unconstitutionally prejudiced by the jury instructions at the guilt phase of the trial.
 
 
 22
 In order to preserve an issue for collateral review under Georgia law, a timely objection must be made at trial and raised on appeal in accordance with Georgia procedural rules. Such procedural default, however, shall be excused upon a showing of cause for noncompliance with such a requirement and of actual prejudice or to avoid a miscarriage of justice.[21] Absent a showing that the "cause and prejudice" standard has been met, a federal court may not grant collateral relief to a state habeas petitioner whose claims are nonreviewable in state court due to procedural default.[22]
 
 
 23
 Devier's only allegation of "cause" sufficient to excuse the procedural default of these claims in state court is his claim that his attorneys rendered ineffective assistance of counsel.[23] As noted above in section II.A., however, we found that Devier's attorneys did not render ineffective assistance of counsel at various episodes during the trial and therefore cannot further conclude that their representation was pervasively deficient throughout the trial. Accordingly, we conclude that Devier has not established sufficient "cause" to excuse the procedural default of these claims.[24]
 
 C. Fourth Amendment
 
 24
 Devier claims that his rights under the Fourth Amendment were violated because he was arrested under authority of a warrant not supported by probable cause and that certain of his statements admitted at trial were the fruits of this allegedly improper arrest. These Fourth Amendment claims were given a full and fair hearing in the state courts: they were raised initially to the trial court in a motion to suppress and an appeal was taken to the Georgia Supreme Court from the denial of this motion.[25] As a result, under the clear language of Stone v. Powell,[26] the district court did not err in holding that it lacked authority to review these claims.[27] Devier urges that this doctrine does not apply to capital cases. This court, however, has applied this doctrine to capital cases in the past,[28] and we see nothing in the language or reasoning of Powell itself or the Supreme Court's more recent pronouncements to support such a distinction.
 
 D. Voluntariness of Confession
 
 25
 Devier next contends that certain incriminating statements elicited by the police shortly after his arrest were the result of an involuntary confession made in violation of due process.[29] In determining whether a particular confession was involuntary, we must look to the "the totality of all the surrounding circumstances--both the characteristics of the accused and the details of the interrogation"[30] to determine whether a confession is the "product of an essentially free and unconstrained choice by its maker" or whether the defendant's "will has been overborne and his capacity for self-determination critically impaired."[31] Because the notion of voluntariness is "amphibian," there is no predetermined formula to apply to the circumstances of a particular case to assess whether or not a confession is involuntary; a court must reach its own considered calculation of when the "forces [of official coercion], under all the prevailing states of stress, are powerful enough to draw forth a confession."[32]
 
 
 26
 After a thorough and exhaustive examination of the 600-page transcript of the Jackson v. Denno[33] hearing in this case, the Georgia Supreme Court found that Devier's confession was voluntarily made.[34] This court is not bound by this prior determination because the "ultimate question whether, under the totality of the circumstances, the challenged confession was obtained in a manner compatible with the requirements of the Constitution is a matter for independent federal determination."[35] Findings by the state court concerning historical facts and assessments of witness credibility are, however, entitled to the same presumption accorded findings of fact under 28 U.S.C. Sec. 2254(d).[36] In addition, a federal habeas court is required to accord "great weight to the considered conclusions of a coequal state judiciary."[37]
 
 
 27
 The record in this case indicates that Devier was first questioned about the Stoner murder on December 1, 1979 by Special Agent Bob Leary of the Federal Bureau of Investigation and two Bartow County Sheriff's deputies at Devier's mobile home in Floyd County. The victim's body, to their knowledge, had not yet been discovered. After identifying himself and the two deputies, Leary told Devier that they were investigating the possible kidnapping of Stoner, who had been reported missing the previous day, that Devier was one of several people they intended to talk to, and that they wanted to know where Devier had been the previous afternoon. After replying that he could not remember his exact whereabouts, Leary asked Devier whether it would help to remember if he would accompany the officers and show them where he had gone after getting off work the previous day. Leary testified at the Jackson-Denno hearing that he told Devier that he was not under arrest and that he was being asked to accompany the officers voluntarily. According to Leary, Devier responded that he understood and voluntarily went with them.
 
 
 28
 The group began to retrace Devier's various movements during the previous day. While heading to a church at which Devier recalled meeting a friend, a call came over the radio advising the officers to go to the area where Mary Frances' body was found. The group arrived at the scene, and the officers, leaving Devier alone in the police car, walked down the road where the victim's body was located. Another officer, who was guarding the crime scene, stood near the police car in which Devier was sitting. Although there was conflicting testimony as to whether Devier was free to leave the car, the district court found that Devier made no attempt to leave or indicate any desire to do so.
 
 
 29
 The officers then returned to the car and continued their drive with Devier. After seeing a friend that Devier claimed to have been with the previous afternoon, the group stopped at a service station, and Leary and one of the deputies went out to talk to the friend. There was also conflicting testimony as to whether the officers would permit Devier to go to the bathroom. On another occasion, however, Leary testified that they allowed Devier to go into a store alone to buy some cigarettes.
 
 
 30
 Having traced the route that Devier indicated he had taken the previous afternoon, the group drove to the Adairsville police department. At the station, Leary gave Devier his Miranda warnings, told him that his car had been identified as the one used by the kidnapper, recounted that his friend had told the officers that he had last seen Devier at 3:00 p.m. leaving a three and a half hour gap unaccounted for, and accused Devier of having kidnapped and murdered Stoner. Devier denied the accusations and made no incriminating statements. Leary then asked Devier if he would accompany him to Cartersville for further questioning. Leary testified that he told Devier that he was not under arrest or in custody and that if he went, it would be a voluntary act on his part. Devier agreed to go on the ground that he wanted to clear himself. They then went to the office of the Bartow County Sheriff in Cartersville where Devier was given a polygraph examination, which he alleges that he "passed." At approximately 6:00 p.m., Devier went home with his brother. Leary testified that if Devier had at anytime said, "Okay, I want to go home," he would have felt obligated to take him home because "[h]e wasn't under arrest."
 
 
 31
 On the next day, December 2, Georgia Bureau of Investigation (GBI) Special Agent Vernon Keenan and Bartow County Sheriff's Department Investigator Ray Sullivan visited Devier at his home at approximately 10:30 a.m. Devier was advised of his Miranda warnings and questioned briefly. At the Jackson-Denno hearing, Devier testified that he freely and voluntarily spoke with these officers because he wanted to help clear up this matter. Due to the attention that Stoner's murder had attracted in Bartow County, Devier was concerned that he might become the focus of this community attention if he did not aid the investigation. Devier consented to having some pictures taken of his car, and the officers then left after spending about an hour at Devier's home.
 
 
 32
 Later that same afternoon, Devier and his family gathered their laundry and drove to Rome. Shortly before 6:00 p.m., Devier was stopped by Officer Pearson of the Rome Police Department pursuant to a lookout which had been placed on his automobile. Officer Bill Hibberts, who was nearby, was also called to the scene. Hibberts took Devier's driver's license and a pistol lying between the front seat and informed Devier that Rome police investigators wanted to talk to him. This officer testified that he was unaware that other investigators had already spoken with Devier. Devier testified that he asked the officer if he was under arrest and the officer told him that he was not, but that "if you know what's good for you, you'll follow me over there." Hibberts testified that Devier agreed to follow him in his car to the Rome police station for questioning. Hibberts led the way in his car, followed by Devier, who was followed by the other officer in his car.
 
 
 33
 Upon their arrival at the Rome police station, Hibberts gave Devier's driver's license and pistol to another officer. Devier was subsequently taken to an office, given his Miranda warnings, and questioned. Several officers, including those from the Bartow County police department and the GBI who had previously talked to Devier, were summoned to the police station. During the questioning, however, Devier made no incriminating statements. Rome and Floyd County police officers continued to question Devier until some time after midnight, when he was allowed to return home. Devier was not questioned again until his arrest on the afternoon of December 6.
 
 
 34
 The investigation continued in the interim, and it was learned that six months previously, Devier had possibly committed the rape of thirteen-year-old Linda Gail Elrod. The investigating officers testified that they felt that there was enough probable cause to support an arrest warrant for the Elrod rape. Although they also believed that there was sufficient probable cause to arrest Devier for the rape and murder of Stoner, they found it to be a closer question and decided to arrest Devier for the Elrod rape.
 
 
 35
 Devier was arrested at approximately 5:30 p.m. on the premises of the Georgia Power Company in Rome and was taken to the Floyd County police station in Rome. After being advised of his Miranda warnings, Devier executed a written waiver of these rights and was interrogated. He subsequently gave a taped confession. During this interrogation, however, the district court found that a number of police officers from Bartow County and the FBI, who had been involved in the investigation, gathered at the police station. Devier expressed fear of the Bartow County officers and of being sent back to that county and asked the Floyd County interrogator not to allow those officers into the interrogation room. The interrogators also correctly told Devier that he would not be sent back to Bartow County if it was determined that the crime had occurred in Floyd County, but that if the crime had occurred in Bartow County, he would be held in custody in that county. After this discussion, Devier confessed to raping and murdering Stoner.
 
 
 36
 The district court further found that Devier was transferred to the Floyd County Jail at approximately 7:30 p.m. that evening. The Sheriff determined that Devier should be housed in the single cell area of the jail for safety reasons because of the nature of the crime that Devier was accused of and the attention that the Stoner disappearance had received in the community. However, that section of the jail was full at the time and, as a result, Devier was transported to the Whitfield County Jail.
 
 
 37
 On the morning of December 7, it was discovered that the tape recorder which the officers had used to record Devier's confession had malfunctioned and that the tape was largely inaudible. As a consequence, Devier was transported to the FBI office in Rome and was advised that he would have to repeat his previous statement. He was again advised of his Miranda warnings, executed a waiver, and repeated the same confession. While making this second statement, Devier told the officers that he had not slept well and had not eaten anything since his arrest because he was upset about being in jail. However, the district court found that all the officers, who observed Devier on December 7 making this second statement, "indicated that he appeared alert, responsive to questions, conscious of what was going on, and never asked that the interview be stopped."
 
 
 38
 After examining the opinions of both the Georgia Supreme Court and the district court on this issue and the transcript of the Jackson-Denno hearing, we agree that the confessions elicited from Devier on December 6 and 7 were voluntarily made and did not offend due process. The events of both December 1 and the morning of December 2 when law enforcement officials questioned Devier at his home were constitutionally innocuous. Most significantly, Devier did not make any inculpatory statements after these two interviews, but rather reaffirmed his innocence throughout these interrogations. Nor do we find that the police questioning of Devier during these two encounters was so psychologically coercive as to taint any later confession.[38] The record amply shows that Devier voluntarily cooperated with the investigating officers in retracing his movements of November 30 and was told by Special Agent Leary that he was not under arrest or considered to be in custody. In addition, Devier testified that he voluntarily went with the officers to continue the questioning at police stations in Adairsville and Cartersville so that he could clear himself. As the district court noted, there is not one iota of evidence in the record which suggests that Devier was subjected to any form of physical or psychological compulsion on December 1. Nor do we find the brief interrogation at Devier's home on the morning of December 2 to be constitutionally problematic. Devier himself testified that he freely and voluntarily spoke with these officers, and he raises no allegation that the officers were coercive in any manner.
 
 
 39
 The Georgia Supreme Court found, however, that Devier was "seized" during his six-hour detention at the Rome police station on the evening of December 2 for fourth amendment purposes and that the length of this seizure exceeded that permissible under a Terry stop.[39] Regardless of whether or not we adopt this conclusion, this alleged illegal detention does not require the suppression of Devier's confession because no incriminating statements were elicited after this particular interrogation.
 
 
 40
 Devier further argues, however, that the psychological coercion he experienced during the interrogation on the evening of December 2 tainted his eventual confession on December 7. We find this argument to be baseless. Devier does not allege, and the record does not support any finding, that he suffered any form of illegal coercion during this interrogation. More importantly, assuming that Devier did suffer some form of unconstitutional compulsion, the time lapse between his detention on the evening of December 2 and his eventual arrest four days later on December 6 is sufficient to remove any illegal taint from his confession.[40] As the Supreme Court has noted, "the temporal proximity of the arrest and the confession, the presence of intervening circumstances, and particularly, the purpose and flagrancy of the official misconduct" are all relevant considerations in determining whether a confession is the fruit of an illegal detention.[41] The record in this case shows that Devier was able to return home after his interrogation and resume his normal daily activities, including returning to work. In those four days, Devier had access to the aid and comfort of friends and family, time to contemplate his situation, and more than ample opportunity to enlist legal assistance. Under these circumstances, we must conclude that any taint from his detention on December 2 had been completely attenuated by the time of his eventual confession four days later.
 
 
 41
 Although Devier had little or no contact with the police between the evening of December 2 and the afternoon of December 6, he contends that the ongoing police investigation was part of a campaign of police coercion to overbear his will. We also find this claim to be meritless. During this period, the record shows that the police were actively investigating Devier as a possible suspect by interviewing his co-workers and investigating his alibis. The mere fact that Devier was uncomfortable or agitated while under the close scrutiny of the police does not render their conduct unconstitutionally coercive. It is no doubt true that being the target of an intense police investigation is bound to create some angst in the subject. Absent some showing that the police actively attempted to harass Devier, however, we cannot conclude that a reasonable and rather routine police investigation violates the strictures of due process.
 
 
 42
 Lastly, we also find that the execution of Devier's arrest on the afternoon of December 6 and his subsequent interrogation by police which elicited his first taped confession was not unconstitutionally coercive. The district court found, and the record clearly supports, that Devier was properly informed of his Miranda rights, waived those rights, and voluntarily agreed to talk with police about the murder of Stoner. Nor do we find any support in the record for Devier's claim that his confession was coerced from him due to the threat of mob violence.[42] Although a crowd of approximately thirty people gathered at the Floyd County police department during Devier's interrogation, the record clearly shows that this group was composed mostly of uniformed police officers and members of the press who had heard rumors of an arrest. The arresting officers also testified that this group was neither loud, unruly, or gripped by a lynch-mob-like mentality. Instead, this crowd milled about the station in a businesslike manner and broke off into several different groups, rather than congregating in one pack. On these facts, we can hardly find that "the culminating threat of mob violence" created such fear in Devier that he immediately produced a confession.[43]
 
 
 43
 We also do not believe that Devier's statement to the arresting officers that he wanted to keep the Bartow County police officers out of the interrogation room indicates that he was terrorized by the threat of mob violence. The district court found that "[b]ecause of his prior run-in with the Bartow County police officers [on the evening of December 2], Devier stated that he did not trust the Bartow police and did not want them in the room." There is no suggestion in the record, however, that the interrogating officers used the threat of allowing the Bartow County police officers or the crowd outside into the room as a coercive tool to force Devier into confessing.[44] Rather, the interrogating officers simply assured Devier that these individuals would not be allowed into the room. As the district court noted, "[a]ny fear or distrust [Devier] may have had of the situation was the product of his own mind, and [was] not taken advantage of in an unconstitutional manner." Given the totality of the circumstances faced by Devier on December 6, we hold that his confession was voluntary and elicited in accordance with the demands of due process.[45]
 
 
 44
 Because there was no illegal taint from Devier's December 6 confession, we find that his confession of December 7, which was actually admitted into trial, did not violate due process. At this interrogation in which a second taped confession was made, Devier was given his Miranda warnings again, executed a waiver, and proceeded to repeat his confession of the prior day. There is no evidence in the record that Devier was physically threatened or otherwise coerced into giving this second confession. At the Jackson-Denno hearing, however, Devier testified that jail had "messed with his mind" and that he had not slept well the previous night. There is no allegation, however, that Devier's sleeplessness was the result of affirmative action by the police, rather than the mere discomfort of spending a first night in jail. The district court specifically found that Devier "did not appear to be confused, irrational, or incoherent" to the interrogating officers and, in fact, was "alert, aware of what was happening to him, and voluntarily agreed to cooperate." Examining the totality of circumstances in light of these factual findings, we conclude that Devier's incriminating statements were voluntarily made and elicited in a manner consistent with constitutional requirements.[46]E. Change of Venue
 
 
 45
 The constitutional guarantee of a fair trial requires that a criminal defendant must be tried by a panel of impartial and indifferent jurors.[47] When pretrial publicity has so prejudiced the community atmosphere surrounding a trial that an impartial jury cannot be seated, due process requires that a trial court must grant a defendant's motion for a change of venue.[48] Although two different standards have evolved to determine whether a trial was so infected by pretrial publicity as to be fundamentally unfair,[49] Devier contends only that constitutional prejudice can be "presumed" from the degree and quality of pretrial publicity surrounding his case. Under this test, "prejudice is presumed from pretrial publicity when (1) pretrial publicity is sufficiently prejudicial and inflammatory, and (2) the prejudicial pretrial publicity saturated the community where the trials were held."[50] As the Supreme Court has noted, cases in which a conviction is overturned on the grounds of presumed prejudice are "relatively rare."[51]
 
 
 46
 The district court found that Devier's trial was the subject of extensive newspaper, radio, and television coverage from the time of his second conviction in March, 1982, the subsequent reversal of this conviction by the Georgia Supreme Court which required the restructuring of the grand jury pool in Floyd County, and his retrial in November, 1983. For example, during this period, the local newspaper, the Rome News Tribune, carried some 130 news articles and editorials about the ongoing criminal proceedings. In addition, the extent of the publicity in the community is borne out by an examination of the voir dire of the prospective jurors. Of the 76 prospective jurors who were asked whether they had learned of the case from the media, 71 responded that they had at least heard of the case. As a result, the district court found that Devier had carried his burden under the second prong of the "presumed prejudice" test that Floyd County was saturated with coverage about his ongoing criminal proceedings.
 
 
 47
 Mere publicity about a case, however, is insufficient to void a conviction.[52] Indeed, in a free society with the capability for "swift, widespread, and diverse methods of communication," it should not be surprising that informed citizens will have learned of a noteworthy case in the community and even formed some impression as to the merits.[53] The publicity surrounding the disappearance and murder of a young child is bound to be fanned by widespread media coverage. We agree with the district court's conclusion that although the publicity surrounding Devier's trial was widespread, the vast majority of the media coverage was simply factual reporting and was neither "invidious [n]or inflammatory."[54] ] A review of the media reports of the trial presented to the district court indicates that Devier failed to establish that "the populace from which his jury was drawn was widely infected by a prejudice apart from mere familiarity with the case."[55]
 
 
 48
 The district court found, and we agree, that most of the reporting of Devier's trial, with the exception of a few letters to the editor and editorials dealing with the Georgia's Supreme Court decision to reformulate the grand jury pool, was essentially factual and was not directed at arousing or inciting the passion of the community. A large proportion of the publicity was also not specifically directed at the facts of his case, but at the subsequent reconstruction of the grand jury system in Floyd County resulting from the Georgia Supreme Court's ruling on Devier's appeal. In addition, many of the newspaper articles presented as exhibits to the district court dealt with Devier's first trial in 1982 and are remote in time from Devier's retrial in November 1983. Thus, any inflammatory publicity resulting from news coverage of his 1982 trial would have dissipated by the time of his third trial a year and a half later.[56]
 
 
 49
 Nor do we believe that constitutional prejudice can be presumed by an examination of the voir dire of the prospective jurors. The record shows that the trial court allowed for sequestration and individual voir dire of the jury panel. Of the 76 jurors in the panel, 16 were excused for cause for reasons related to publicity because they conceded that they had already formed an opinion as to Devier's guilt or innocence that they could not set aside. Six jurors were excused for unrelated reasons of personal hardship. Of the 54 other jurors, 32 stated that they had heard of Devier's prior conviction. Eleven of the remaining 22 jurors had some knowledge of the case, but not necessarily that Devier had been previously tried and convicted. Five jurors stated that they had no prior knowledge of the case before coming to court. Although it is certainly true that a large proportion of the jurors had some knowledge of the crime, we cannot say that the voir dire raises an inference that pretrial publicity so infected Devier's trial as to deny him a fair trial.[57] As the Supreme Court has noted, "the mere existence of any preconceived notion [by a juror] as to the guilt or innocence, without more" is insufficient to establish a claim of prejudicial pretrial publicity.[58] Viewing the totality of the circumstances, we conclude that because Devier did not suffer any prejudice from pretrial publicity, the trial court did not err in failing to grant his motion for a change of venue.
 
 F. Jury Instructions at Sentencing Phase
 
 50
 After hearing oral argument, we remanded this case to the district court for the limited purpose of determining whether the jury charge at the sentencing phase vested the jury with unbridled discretion to impose the death penalty. The Georgia Supreme Court, sua sponte, had earlier "express[ed its] disapproval" of these instructions, but found, that the charge as a whole "clarified the extent of the jury's discretion regarding the imposition of the punishment."[59] Adopting essentially the same reasoning, the district court also upheld these instructions.
 
 
 51
 At the close of the sentencing phase, the trial court instructed the jury that "[t]he law vests in the jury the exclusive right to either make or withhold a recommendation for the death penalty.... The sentences to be imposed in this case are entirely within your discretion." Devier contends that this portion of the charge failed to suitably channel the jury's discretion in determining Devier's fate at sentencing so as to minimize the risk of an arbitrary and capricious decision.[60] In reviewing a challenge to a trial court's jury instructions, a court must first focus on how a reasonable juror would understand the specific language challenged. If the specific charge is found to be unconstitutional, then the instructions, as a whole, must be examined to determine whether the entire charge reflected a correct statement of the law.[61] We agree with both the district court and Georgia Supreme Court that although the challenged language, viewed in isolation, is constitutionally problematic, the charge as a whole accurately reflected the law in instructing the jury as to its responsibilities.
 
 
 52
 At the outset of his instructions, the trial court charged the jury that "[t]he law of Georgia provides that the death penalty may be imposed in certain cases provided the jury finds beyond a reasonable doubt that the offense for which the accused was convicted was committed under circumstances which the law describes as statutory aggravating circumstances." The trial court instructed on the specific statutory aggravating factors sought by the state as to the offenses of murder and rape. The jury was then told that "[i]f you find and believe, beyond a reasonable doubt, that the offense of murder was committed under one or more of the statutory aggravating circumstances as contended by the State, you may recommend that this defendant be put to death." The jury was instructed as to the form of the verdict for a sentence of death or life imprisonment for the offense of murder and the form of the verdict for a sentence of death, life imprisonment, or a lesser punishment for the offense of rape.
 
 
 53
 The trial court next advised the jury that "mitigating circumstances are those circumstances which in fairness and mercy shall be considered by you in fixing the punishment." The jury was charged that they were "authorized and directed to consider as a mitigating factor any aspect of the defendant's character or record and any of the circumstances of the offense that the defense offers as a basis for a sentence less than death." The trial court's next set of instructions included that portion now being challenged by Devier:
 
 
 54
 As to each of the counts, Ladies and Gentlemen, I charge you that even if you should find beyond a reasonable doubt that the State has proved the existence of a statutory aggravating circumstance or circumstances which would justify the imposition of a death sentence, you are not required to recommend that the accused [sic] to put to death, and this is so even though you find that no mitigating circumstances were shown. Even though you may be authorized to recommend the death penalty, you are not required to do so. The law vests in the jury the exclusive right to either make or withhold a recommendation for the death penalty.
 
 
 55
 The sentences to be imposed in this case are entirely within your discretion, and you may provide for a life sentence for murder for this accused or a life sentence or less for rape for this accused for any reason that is satisfactory to you or without any reason, if you care to do so.
 
 
 56
 Of course, as to each of the counts; that is, Count I and Count II, if the State has failed to prove beyond a reasonable doubt that the offense charged was committed under one or more of the statutory aggravating circumstances, as contended by the State, and described to you by the Court, you would not be authorized to recommend the death penalty. Without such a finding, the death penalty cannot be imposed.
 
 
 57
 The trial court then instructed the jury as to the form of the verdict if it decided to recommend life imprisonment for the murder charge and life imprisonment or a lesser punishment for the rape charge. The trial court concluded by charging the jury that it must state, in writing, those statutory aggravating circumstances it found beyond a reasonable doubt, if it recommended a sentence of death. Prior to reiterating the aggravating factors for the offenses of murder and rape, the trial court gave the following statement that Devier also challenges: "I instruct you that if you see fit to do, and this is left entirely up to you, you may consider the following enumerated statutory aggravating circumstances."
 
 
 58
 Although we are also disturbed by some of the trial court's exact language, we do not believe that a reasonable juror, after hearing the entire charge, would interpret these instructions as giving him unbridled discretion in the decision whether to recommend a sentence of death. The jury was told that in order to recommend a sentence of death, they must first find that a statutory aggravating factor had been established. The trial court specifically instructed, however, that even if it found the existence of one or more statutory aggravating circumstances, they need not recommend a death sentence, despite the fact that no mitigating circumstances were shown. While the challenged portions of the instruction, viewed in isolation, may seem to give the jury free rein in its sentencing decision, the instructions as a whole required the jury to focus its deliberations on the circumstances of the crime and Devier's character and provided specific and detailed guidance as to whether or not to impose the death penalty.[62]
 
 
 59
 G. Admission of Unadjudicated Crime as Nonstatutory Aggravating Factor
 
 
 60
 The final issue in this appeal is whether the presentation of evidence of an unadjudicated criminal offense allegedly committed by Devier violated the Eighth Amendment.[63] At the sentencing hearing in this case, Linda Elrod testified that approximately six months prior to the murder of Stoner, Devier raped her in the back seat of his car while parked on a dirt road. At the time of this alleged crime, Elrod was thirteen years old. Devier argues that evidence of an unadjudicated crime is inherently unreliable and thus inadmissible under the Eighth Amendment. He also argues that, even if such evidence can constitutionally be admitted at the sentencing hearing, absent instructions as to the standard of proof by which the State must establish its asserted nonstatutory aggravating circumstances, the jury's consideration of such evidence when making its final sentencing determination violates the Eighth Amendment. No such instructions were requested or given in this case.
 
 
 61
 Devier's first argument is foreclosed by the opinion of the en banc court in Tucker v. Kemp.[64] In that case, we wrote that
 
 
 62
 [o]ne class of information which is particularly relevant to the sentencing decision is the defendant's previous criminal activity. In addition to previous convictions, it is acceptable to consider evidence of crimes for which a defendant has been indicted but not convicted. Activities for which there has been no charge filed can be considered as well. In general, the relevant inquiry for information at sentencing is whether it is reliable.[65]
 
 
 63
 Elrod's testimony in this case was sufficiently reliable to be admitted in evidence. Although corroboration of a victim's testimony is necessary to prove statutory rape under Georgia law,[66] the alleged unadjudicated crime in this case was not merely statutory rape, but forcible rape. Elrod testified that Devier grabbed her by the throat, threw her head against the car window, made her get into the backseat of the car and remove her clothes, and had sexual intercourse with her without her consent. That Elrod was under the age of fourteen at the time does not necessarily mean that statutory rape is the relevant offense; a person may be guilty of forcibly raping a thirteen-year-old girl. Corroboration of the victim's testimony is not necessary in Georgia for a conviction of forcible rape.[67] Hence, the fact that the Elrod testimony was uncorroborated does not mean it was unreliable. To the contrary, the Georgia Supreme Court explicitly held in the direct appeal of this case that "the prior rape was proved" by Elrod's testimony.[68] Thus, the admission of the Elrod testimony did not violate Devier's Eighth Amendment rights.
 
 
 64
 Devier's second argument--that the jury should have been instructed as to the standard by which the State had to prove the alleged Elrod rape before it could consider the incident as a nonstatutory aggravating circumstance--also is unavailing. In Henderson v. Kibbe,[69] the Supreme Court explained that
 
 
 65
 [o]rderly procedure requires that respective adversaries' views as to how the jury should be instructed be presented to the trial judge in time to enable him to deliver an accurate charge and to minimize the risk of committing reversible error. It is the rare case in which an improper instruction will justify reversal of a criminal conviction when no objection has been made in the trial court.[70]
 
 Hence, the Court held that
 
 66
 [t]he burden of demonstrating that an erroneous instruction was so prejudicial that it will support a collateral attack on the constitutional validity of a state court's judgment is even greater than the showing required to establish plain error on direct appeal. The question in such a collateral proceeding is "whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process," not merely whether "the instruction is undesirable, erroneous, or even 'universally condemned[.]' "[71]
 
 
 67
 The petitioner's burden is "especially heavy" when his claim is based on an omission or an incomplete instruction, rather than an erroneous instruction.[72] Such an error is less likely to be prejudicial than an affirmative misstatement of the law.[73]
 
 
 68
 In Adams v. Wainwright,[74] this circuit applied Henderson to a challenge to the instructions at the sentencing phase of a capital trial. The sentencing instructions in Adams listed several potential statutory aggravating factors for the jury to consider. Among them was the assertion that the killing had occurred during the commission of, or an attempt to commit, rape or kidnapping. The trial court, however, did not define the elements of those predicate felonies.[75] Citing Henderson, the Adams court held that the incomplete jury instruction did not so infect the entire sentencing proceeding that the penalty ultimately imposed violated the petitioner's due process rights.[76] The court stressed that "[a]n incomplete instruction is less likely to prejudice the defendant than one which is substantively incorrect."[77] Moreover, the court held, "a claim of prejudice is particularly remote where the defendant did not object to the instruction's lack of completeness when the opportunity arose."[78] In view of these circumstances, as well as the fact that the evidence supported the finding that the murder occurred during the commission of, or attempt to commit, rape and kidnapping, the court held that habeas relief was unwarranted.
 
 
 69
 Like the petitioner in Adams, Devier failed to object at sentencing to the lack of a standard of proof instruction. Indeed, he did not question the absence of the standard of proof instruction until he filed his state postconviction petition. Furthermore, he claims that the trial court improperly omitted an instruction, rather than gave an affirmatively erroneous one. Under Georgia law, once the State proves the existence of one statutory aggravating circumstance the jury may consider "[a]ny lawful evidence which tends to show the motive of the defendant, his lack of remorse, his general moral character, and his predisposition to commit other crimes."[79] Elrod's testimony was constitutionally reliable and relevant as a nonstatutory aggravating circumstance. The defense cross-examined Elrod and offered impeaching evidence and evidence in mitigation of punishment. The jury found that the State established several statutory aggravating circumstances, including that the murder was outrageously or wantonly vile, horrible, or inhuman, and that it was committed while Devier was engaged in the commission of rape, kidnapping with bodily injury, and aggravated battery. Under the totality of these circumstances, we do not find this case meaningfully distinguishable from Adams. Accordingly, we reverse the district court's grant of habeas relief as to sentencing.
 
 III.
 
 70
 For the foregoing reasons, the order of the district court upholding Devier's convictions and directing that he be resentenced is AFFIRMED in part and REVERSED in part.
 
 
 71
 KRAVITCH, Circuit Judge, concurring specially, in which CLARK, Senior Circuit Judge, joins:
 
 
 72
 Because I believe that this case is controlled by the principles announced in Henderson and applied in Adams--largely because Devier never requested an instruction on the standard of proof with respect to the alleged Elrod rape--I join the per curiam opinion in its entirety. I write separately, however, to state my concern about the reliability of death sentences based in part on evidence of unadjudicated crimes absent guidance to the jury on how to consider that evidence.
 
 
 73
 The mere fact that evidence of the defendant's alleged unadjudicated criminal activity is sufficiently reliable to be admitted in evidence at a capital sentencing hearing does not mean that the jury's sentence based on that evidence necessarily is constitutionally reliable. The basic requirements of reliability and fundamental fairness extend to the entire sentencing process. See, e.g., Woodson v. North Carolina, 428 U.S. 280, 305, 96 S.Ct. 2978, 2991, 49 L.Ed.2d 944 (1976) ("Because of [the qualitative difference between the death penalty and a sentence of imprisonment], there is a corresponding difference in the need for reliability in the determination that death is the appropriate punishment in a specific case."). The crucial Eighth Amendment question is whether the ultimate sentencing decision is reliable, not whether the admission of certain evidence is reliable.
 
 
 74
 Assertions by the State at a capital sentencing hearing that the defendant committed crimes for which he has not been convicted are inherently suspect. As the Fifth Circuit has explained, "there remains a long-held reservation about the use of wrongdoing not then being tried. These concerns express our acceptance that a jury suffers the human weakness of blending wrongs--a result inconsistent with our fundamental commitment to charge specificity, jeopardy and due process." Milton v. Procunier, 744 F.2d 1091, 1097 (5th Cir.1984), cert. denied, 471 U.S. 1030, 105 S.Ct. 2050, 85 L.Ed.2d 323 (1985). On the other hand, the State has an important interest in presenting to the sentencing jury all relevant evidence regarding the defendant's character. Once the State establishes at least one statutory aggravating circumstance, the jury constitutionally may consider any conduct that reflects upon the defendant's character. See Zant v. Stephens, 462 U.S. 862, 878, 103 S.Ct. 2733, 2743, 77 L.Ed.2d 235 (1983). The defendant's prior criminal activity is one example of such conduct. The courts, therefore, generally should give effect to the State's legitimate interest in informing the jury about the defendant's prior criminal conduct without infringing on the defendant's right to a reliable and fundamentally fair sentencing proceeding.
 
 
 75
 The American justice system typically balances these competing concerns by requiring the State to present evidence sufficient to satisfy an applicable standard of proof and the court to properly instruct the jury as to that standard. See, e.g., Sandstrom v. Montana, 442 U.S. 510, 524, 99 S.Ct. 2450, 2459, 61 L.Ed.2d 39 (1979) (holding that jury must be instructed to find each element of the crime under the proper standard of proof).
 
 
 76
 The function of a standard of proof, as that concept is embodied in the Due Process Clause and in the realm of factfinding, is to "instruct the factfinder concerning the degree of confidence our society thinks he should have in the correctness of factual conclusions for a particular type of adjudication." The standard serves to allocate the risk of error between the litigants and to indicate the relative importance attached to the ultimate decision.
 
 
 77
 Addington v. Texas, 441 U.S. 418, 423, 99 S.Ct. 1804, 1808, 60 L.Ed.2d 323 (1979) (quoting In re Winship, 397 U.S. 358, 370, 90 S.Ct. 1068, 1076, 25 L.Ed.2d 368 (1970) (Harlan, J., concurring)).
 
 
 78
 Just as it is necessary to instruct the jury as to the standard by which the State must prove the elements of the primary crime in order to guarantee a fundamentally fair guilt-innocence proceeding, so too the jury must be instructed as to the standard by which the State must prove unadjudicated criminal conduct to be used as a nonstatutory aggravating circumstance in order to guarantee a fundamentally fair sentencing proceeding. Without a proper instruction as to the sufficiency of proof for nonstatutory aggravating circumstances, the jury may include in its life or death equation factors which in fact may be supported by an unreliably small quantum of evidence. Requiring a proper instruction, on the other hand, in no way interferes with the State's countervailing interest in presenting relevant evidence of the defendant's character.
 
 
 79
 The lone federal court of appeals squarely to address the admissibility of unadjudicated-crimes evidence at the sentencing phase of a capital trial has acknowledged these principles. In Milton v. Procunier the Fifth Circuit justified its admission of unadjudicated-crimes evidence by stressing that the defendant is protected by devices other than the automatic exclusion of potentially relevant character evidence--"by properly applied standards of relevance and sufficiency of proof." 744 F.2d at 1097 (emphasis added). Indeed, several states expressly require that the State prove extraneous criminal conduct at the sentencing phase of a capital trial by at least clear and convincing evidence. See, e.g., People v. Balderas, 41 Cal.3d 144, 222 Cal.Rptr. 184, 711 P.2d 480, 515-16 (1985) (beyond a reasonable doubt); State v. Brooks, 541 So.2d 801, 814 (La.1989) (clear and convincing evidence).
 
 
 80
 Henderson and Adams do not apply with the same force when a capital defendant requests a standard of proof instruction regarding unadjudicated crimes evidence introduced at sentencing. In that circumstance, redress for a habeas petitioner is much more readily available. Upon request by defense counsel, therefore, the trial judge in capital cases should instruct the sentencing jury as to the standard by which the State must prove the defendant committed the crime. Failure to provide such an instruction would impermissibly impinge on the defendant's right to a reliable and fundamentally fair sentencing determination.
 
 
 
 [1]
 See Devier v. State, 250 Ga. 652, 300 S.E.2d 490 (1983). The Georgia Supreme Court had earlier denied certain other claims raised by Devier, not relevant here, on interlocutory appeal. See Devier v. State, 247 Ga. 635, 277 S.E.2d 729 (1981)
 
 
 [2]
 See Devier v. State, 253 Ga. 604, 323 S.E.2d 150 (1984)
 
 
 [3]
 See Devier v. Georgia, 471 U.S. 1009, 105 S.Ct. 1877, 85 L.Ed.2d 169 (1985)
 
 
 [4]
 See Devier v. Kemp, 484 U.S. 948, 108 S.Ct. 338, 98 L.Ed.2d 365 (1987)
 
 
 [5]
 In this petition, Devier raised the following claims: (1) he had been denied effective assistance of counsel at both the guilt and penalty phases of his trial; (2) the trial court admitted statements that were the result of an involuntary confession; (3) he had been denied a fair sentencing as a result of the admission of testimony concerning a prior rape that he allegedly committed; (4) the testimony concerning an alleged prior rape had been introduced without prior notice; (5) he had been arrested pursuant to a warrant not supported by probable cause; (6) certain of his admitted statements were the fruits of an unlawful arrest; (7) he had been unfairly prejudiced by the introduction of photographs of the victim; (8) he had been unfairly prejudiced by the proximity of armed guards to him during the trial; (9) the closing arguments of the prosecutor at both the guilt and penalty phases were intended to inflame and prejudice the jury; (10) Georgia's Unified Appeal Procedure, see Ga.Code Ann. Sec. 17-10-36 (1990), is unconstitutional; (11) he was denied a fair trial by the failure of the district court to grant a change of venue; (12) he was denied a fair trial by the trial court's failure to provide funds for the employment of investigators and expert witnesses; (13) the trial court's sentencing charge was unconstitutional; (14) the "death qualification" of the jury deprived him of a fair and impartial jury; and (15) the "death qualification" of the jury deprived him of a representative cross-section of the community
 
 
 [6]
 Strickland v. Washington, 466 U.S. 668, 688, 694, 104 S.Ct. 2052, 2064, 2068, 80 L.Ed.2d 674 (1984)
 
 
 [7]
 See id. at 689, 104 S.Ct. at 2065
 
 
 [8]
 See id. at 688-91, 104 S.Ct. at 2065-66
 
 
 [9]
 Although the district court did not directly address this claim in its Order, we find its discussion of Devier's other ineffective assistance of counsel claims to be sufficiently complementary to merit review on this appeal
 
 
 [10]
 See, e.g., Stephens v. Kemp, 846 F.2d 642, 652-53 (11th Cir.) (defense counsel on notice that defendant had been in a mental hospital shortly before the criminal offense), cert. denied, 488 U.S. 872, 109 S.Ct. 189, 102 L.Ed.2d 158 (1988)
 
 
 [11]
 See Darden v. Wainwright, 477 U.S. 168, 178-83, 106 S.Ct. 2464, 2470-72, 91 L.Ed.2d 144 (1986)
 
 
 [12]
 See Leggett v. State, 256 Ga. 274, 347 S.E.2d 580, 581 (1986); Curry v. State, 255 Ga. 215, 336 S.E.2d 762, 769 (1985), cert. denied, 475 U.S. 1090, 106 S.Ct. 1480, 89 L.Ed.2d 734 (1986)
 
 
 [13]
 We also find that counsel's failure to present evidence of Devier's possible use of marijuana at the time of the crime as mitigating evidence during the penalty phase of the trial did not amount to ineffective assistance of counsel
 
 
 [14]
 Stephens v. Zant, 716 F.2d 276, 277 (5th Cir.1983) (former Fifth Circuit). Devier also raises the following pro forma claims of ineffective assistance of counsel at the guilt phase on this appeal: (1) failure to interview the State's witnesses prior to trial; (2) failure to present substantial evidence and legal authority in support of the motion for a change of venue; (3) failure to preserve a potential challenge based on Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968) by not using all available peremptory challenges at jury selection; (4) failure to perform adequate research prior to advising Devier to waive a challenge to the grand jury and traverse jury array; (5) failure to support adequately a motion seeking funds for expert review of the State's physical evidence; and (6) failure to request a jury instruction on the issue of the voluntariness of the confession. These contentions were reviewed and rejected by both the state court and district court, and our independent review indicates that these specific allegations of ineffective assistance of counsel are meritless
 
 
 [15]
 United States v. Cronic, 466 U.S. 648, 665 n. 38, 104 S.Ct. 2039, 2050 n. 38, 80 L.Ed.2d 657 (1984)
 
 
 [16]
 Burger v. Kemp, 483 U.S. 776, 795, 107 S.Ct. 3114, 3126, 97 L.Ed.2d 638 (1987)
 
 
 [17]
 Strickland, 466 U.S. at 690, 104 S.Ct. at 2066
 
 
 [18]
 See Lightbourne v. Dugger, 829 F.2d 1012, 1025-26 (11th Cir.1987), cert. denied, 488 U.S. 934, 109 S.Ct. 329, 102 L.Ed.2d 346 (1988). In his petition, Devier also contends that his lawyers failed to procure expert psychological testimony on the effect that his traumatic upbringing had on his social and emotional development as a child and later as an adult. In the district court, Devier introduced the affidavit of Dr. Howard E. Albrecht, a clinical psychologist, which chronicles various aspects of Devier's childhood and an evaluation of the effect of these events on Devier. Albrecht's affidavit, however, merely reiterates in clinical terms the testimony of childhood abuse from lay witnesses that Devier contends his attorneys should have introduced as mitigating evidence. Thus, as noted above, the omission of such testimony at the penalty phase, whether from expert or lay witnesses, does not amount to ineffective assistance of counsel
 
 
 [19]
 See, e.g., Darden, 477 U.S. at 178-83, 106 S.Ct. at 2470-72
 
 
 [20]
 Devier also raises the following pro forma claims of ineffective assistance of counsel at the sentencing phase: (1) failure to object to a jury instruction stating that the "sentences to be imposed ... are entirely within your discretion"; (2) failure to object to the introduction of a prior rape as a nonstatutory aggravating factor; (3) failure to proffer results of a polygraph examination casting doubt on Devier's guilt; (4) failure to present evidence concerning the unconstitutionality of a "death-qualified" jury; (5) failure to develop any mitigating evidence from Devier's school, military, or medical records; (6) failure to perform adequate research on federal and state restrictions on sentencing in capital cases; and (7) failure to make an appropriate request for funds to pay an investigator, psychiatrist, or other experts. These contentions were reviewed and rejected by both the state court and district court. After an independent review, we also find these claims to be meritless
 
 
 [21]
 See Ga.Code Ann. Sec. 9-14-48(d) (Supp.1990); Black v. Hardin, 255 Ga. 239, 336 S.E.2d 754 (1985)
 
 
 [22]
 See Wainwright v. Sykes, 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977); Lindsey v. Smith, 820 F.2d 1137, 1142-45 (11th Cir.1987), cert. denied, 489 U.S. 1059, 109 S.Ct. 1327, 103 L.Ed.2d 595 (1989)
 
 
 [23]
 See Murray v. Carrier, 477 U.S. 478, 488, 106 S.Ct. 2639, 2645, 91 L.Ed.2d 397 (1986)
 
 
 [24]
 See Lancaster v. Newsome, 880 F.2d 362, 376 (11th Cir.1989). Devier also contends that the law of this circuit requires that a district court hold an evidentiary hearing when there is an issue as to whether a habeas petitioner's claims are procedurally defaulted. No such requirement exists in this circuit. See Williams v. Maggio, 679 F.2d 381, 393 (Former 5th Cir.1982) (en banc) (no need for evidentiary hearing where ineffective assistance of counsel claim could be denied based on the record), cert. denied, 463 U.S. 1214, 103 S.Ct. 3553, 77 L.Ed.2d 1399 (1983). When an evidentiary hearing has been held in state court so as to develop an adequate record to apply the "cause and prejudice" test, a second duplicative federal hearing is not mandated. Cf. Demps v. Wainwright, 805 F.2d 1426, 1433-37 (11th Cir.1986), cert. denied, 484 U.S. 873, 108 S.Ct. 209, 98 L.Ed.2d 160 (1987)
 
 
 [25]
 See Devier, 277 S.E.2d at 730-33
 
 
 [26]
 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976)
 
 
 [27]
 See id. at 489-96; 96 S.Ct. at 3050-52
 
 
 [28]
 See, e.g., Hance v. Zant, 696 F.2d 940, 947 (11th Cir.), cert. denied, 463 U.S. 1210, 103 S.Ct. 3544, 77 L.Ed.2d 1393 (1983)
 
 
 [29]
 See Brown v. Mississippi, 297 U.S. 278, 286, 56 S.Ct. 461, 465, 80 L.Ed. 682 (1936)
 
 
 [30]
 Schneckloth v. Bustamonte, 412 U.S. 218, 226, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973); accord Fikes v. Alabama, 352 U.S. 191, 77 S.Ct. 281, 1 L.Ed.2d 246 (1957)
 
 
 [31]
 Culombe v. Connecticut, 367 U.S. 568, 602, 81 S.Ct. 1860, 1879, 6 L.Ed.2d 1037 (1961) (opinion of Frankfurter, J.)
 
 
 [32]
 Id. at 605, 81 S.Ct. at 1880; accord Martin v. Wainwright, 770 F.2d 918, 924-25 (11th Cir.1985), cert. denied, 479 U.S. 909, 107 S.Ct. 307, 93 L.Ed.2d 281 (1986)
 
 
 [33]
 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964)
 
 
 [34]
 See Devier, 323 S.E.2d at 157-162
 
 
 [35]
 Miller v. Fenton, 474 U.S. 104, 112, 106 S.Ct. 445, 450-51, 88 L.Ed.2d 405 (1985)
 
 
 [36]
 See Williams v. Kemp, 846 F.2d 1276, 1282 (11th Cir.1988), cert. dismissed, 489 U.S. 1094, 109 S.Ct. 1579, 103 L.Ed.2d 931 (1989); Williams v. Johnson, 845 F.2d 906, 909 (11th Cir.1988)
 
 
 [37]
 Miller, 474 U.S. at 112, 106 S.Ct. at 450
 
 
 [38]
 See Watts v. Indiana, 338 U.S. 49, 53-54, 69 S.Ct. 1347, 1349-50, 93 L.Ed. 1801 (1949)
 
 
 [39]
 See Devier, 323 S.E.2d at 161. See generally Dunaway v. New York, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979); Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)
 
 
 [40]
 See Rawlings v. Kentucky, 448 U.S. 98, 106-110, 100 S.Ct. 2556, 2562-64, 65 L.Ed.2d 633 (1980); Wong Sun v. United States, 371 U.S. 471, 490, 83 S.Ct. 407, 419, 9 L.Ed.2d 441 (1963) (holding that confession of defendant who had been illegally arrested, released on his own recognizance, and returned voluntarily several days later to make incriminating statements need not be suppressed because connection between the arrest and the statement had " 'become so attenuated as to dissipate the taint' ")
 
 
 [41]
 Brown v. Illinois, 422 U.S. 590, 603-04, 95 S.Ct. 2254, 2261-62, 45 L.Ed.2d 416 (1975)
 
 
 [42]
 See, e.g., Payne v. Arkansas, 356 U.S. 560, 566-68, 78 S.Ct. 844, 849-50, 2 L.Ed.2d 975 (1958)
 
 
 [43]
 Id. at 567, 78 S.Ct. at 850
 
 
 [44]
 See, e.g., id. at 564, 78 S.Ct. at 848 (suspect was told by police officer that a mob was waiting outside and that if he confessed, the officer " 'would try to keep them out' ")
 
 
 [45]
 Through Dr. Albrecht's affidavit, Devier also contends that he was psychologically predisposed to being "easily cowed into agreeing to anything." Although the mental capacity of Devier is surely one factor to be considered in evaluating the totality of the circumstances, see Culombe, 367 U.S. at 620, 81 S.Ct. at 1888, we do not find that he was so seriously deficient as to be particularly sensitive to police questioning. While Dr. Albrecht's affidavit suggests that Devier was tested to be below average on some measures of intellectual ability, we find a total absence of any evidence in the record that the police engaged in any type of coercive interrogation on December 6 or 7. Even assuming that Dr. Albrecht's findings are correct, the police did not use any tactics that might have overborne Devier's will. The district court therefore did not err in rejecting this evidence or failing to hold an evidentiary hearing on Dr. Albrecht's findings
 
 
 [46]
 The same factors that lead us to conclude that Devier's confession on December 7 was not coerced also compel us to find that his waiver of the Miranda rights was voluntarily made. See Colorado v. Connelly, 479 U.S. 157, 170-71, 107 S.Ct. 515, 523, 93 L.Ed.2d 473 (1986) (stating that "[t]here is obviously no reason to require more in the way of a 'voluntariness' inquiry in the Miranda waiver context than in the Fourteenth Amendment confession context"). In addition, we find that Devier made a "knowing" and "intelligent" waiver of his Miranda rights. See Miller v. Dugger, 838 F.2d 1530, 1537-40 (11th Cir.), cert. denied, 486 U.S. 1061, 108 S.Ct. 2832, 100 L.Ed.2d 933 (1988). The record shows that Devier was read his Miranda warnings, the last of several such renditions during the past week, and that he executed a signed waiver of these rights. Although Dr. Albrecht's affidavit indicates that Devier possessed below average intellectual abilities in some areas, there is nothing in the record to suggest that he was so impaired as to not understand the meaning of the Miranda warnings. See id. at 1539 (listing cases in which it has been held that a defendant's youth, mental illness, mental retardation, and language difficulties can vitiate a finding of knowing and intelligent waiver)
 
 
 [47]
 See Irvin v. Dowd, 366 U.S. 717, 722, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751 (1961)
 
 
 [48]
 See Rideau v. Louisiana, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963)
 
 
 [49]
 See Coleman v. Zant, 708 F.2d 541, 544 (11th Cir.1983). Under the actual prejudice test, a defendant must show that one or more jurors entertained an opinion prior to trial that the defendant was guilty and that these jurors "could not have laid aside these performed opinions and 'render[ed] a verdict based on the evidence presented in court.' " Id. (quoting Irvin, 366 U.S. at 723, 81 S.Ct. at 1643). Although Devier does not make a claim based on the actual prejudice standard, as discussed below, he argues that the voir dire of the jury provides evidence supporting an inference that prejudice should be presumed
 
 
 [50]
 See id. at 544; see also Murphy v. Florida, 421 U.S. 794, 798-99, 95 S.Ct. 2031, 2035-36, 44 L.Ed.2d 589 (1975); Rideau, 373 U.S. at 727, 83 S.Ct. at 1419-20; Mayola v. Alabama, 623 F.2d 992, 996-97 (5th Cir.1980), cert. denied, 451 U.S. 913, 101 S.Ct. 1986, 68 L.Ed.2d 303 (1981)
 
 
 [51]
 See Nebraska Press Ass'n v. Stuart, 427 U.S. 539, 554, 96 S.Ct. 2791, 2800, 49 L.Ed.2d 683 (1976); Bundy v. Dugger, 850 F.2d 1402, 1424-25 (11th Cir.1988), cert. denied, 488 U.S. 1034, 109 S.Ct. 849, 102 L.Ed.2d 980 (1989)
 
 
 [52]
 See Nebraska Press, 427 U.S. at 554-55, 96 S.Ct. at 2800
 
 
 [53]
 Irvin, 366 U.S. at 722-23, 81 S.Ct. at 1642
 
 
 [54]
 Murphy, 421 U.S. at 800 n. 4, 95 S.Ct. at 2036 n. 4; accord Mayola, 623 F.2d at 997-99; Coleman v. Kemp, 778 F.2d 1487, 1490, 1538 (11th Cir.1985), cert. denied, 476 U.S. 1164, 106 S.Ct. 2289, 90 L.Ed.2d 730 (1986)
 
 
 [55]
 Mayola, 623 F.2d at 999; accord Bundy, 850 F.2d at 1425
 
 
 [56]
 See Patton v. Yount, 467 U.S. 1025, 1031-34, 104 S.Ct. 2885, 2889-90, 81 L.Ed.2d 847 (1984)
 
 
 [57]
 See id. at 1031-35, 104 S.Ct. at 2889-91 (holding no presumption of prejudice in case in which all but 2 of 163 venirepersons had heard of the case and 126 venirepersons admitted that they would carry that opinion into the jury box)
 
 
 [58]
 Irvin, 366 U.S. at 723, 81 S.Ct. at 1642 (emphasis added)
 
 
 [59]
 Devier, 323 S.E.2d at 163
 
 
 [60]
 See Gregg v. Georgia, 428 U.S. 153, 188-195, 96 S.Ct. 2909, 2932-36, 49 L.Ed.2d 859 (1976)
 
 
 [61]
 See California v. Brown, 479 U.S. 538, 541, 107 S.Ct. 837, 839, 93 L.Ed.2d 934 (1987); Peek v. Kemp, 784 F.2d 1479, 1489 (11th Cir.) (en banc), cert. denied, 479 U.S. 939, 107 S.Ct. 421, 93 L.Ed.2d 371 (1986)
 
 
 [62]
 Brown, 479 U.S. at 541, 107 S.Ct. at 839. As we noted in Williams v. Kemp, 846 F.2d at 1284-85, language similar to that challenged by Devier aids in informing the jury of their "wide discretion to recommend against a death sentence" and provides the jury "with a clear basis to focus upon and consider evidence of mitigating circumstances."
 We also find that the instructions did not overemphasize the presentation of the aggravating factors at the expense of informing the jury of the importance of the mitigating factors or that any other factor in the full context of the sentencing instructions and the proceedings would lead the jury to misinterpret the trial court's charge. See Burden v. Zant, 903 F.2d 1352, 1367 (11th Cir.1990), rev'd on other grounds, 498 U.S. 433, 111 S.Ct. 862, 112 L.Ed.2d 962 (1991); Williams, 846 F.2d at 1284-85, Peek, 784 F.2d at 1486. Indeed, some of the language challenged on this appeal is virtually identical to that which was implicitly upheld in Burden. See 903 F.2d at 1367 n. 10.
 
 
 [63]
 On direct appeal, the Georgia Supreme Court held that because the nonstatutory aggravating circumstance of an unadjudicated crime had been proven by the testimony of the alleged victim, there was no bar under state law to the admission of this evidence. See Devier, 323 S.E.2d at 163-64. Under Georgia law, the State is permitted to prove nonstatutory aggravating circumstances, so long as at it proves at least one statutory aggravating circumstance. See Ga.Code Ann. Sec. 17-10-2, -30(b); Zant v. Stephens, 462 U.S. 862, 878, 103 S.Ct. 2733, 2743, 77 L.Ed.2d 235 (1983) (holding that Georgia statute does not violate the Constitution)
 
 
 [64]
 762 F.2d 1480 (11th Cir.) (en banc), vacated, 474 U.S. 1001, 106 S.Ct. 517, 88 L.Ed.2d 452 (1985), reinstated, 802 F.2d 1293 (11th Cir.1986), cert. denied, 480 U.S. 911, 107 S.Ct. 1359, 94 L.Ed.2d 529 (1987)
 
 
 [65]
 Id. at 1487 (citations omitted)
 
 
 [66]
 See Ga.Code Ann. Sec. 16-6-3(a)
 
 
 [67]
 See Hanvey v. State, 186 Ga.App. 690, 368 S.E.2d 357, 360 (1988)
 
 
 [68]
 Devier, 323 S.E.2d at 164
 
 
 [69]
 431 U.S. 145, 97 S.Ct. 1730, 52 L.Ed.2d 203 (1977)
 
 
 [70]
 Id. at 154, 97 S.Ct. at 1736
 
 
 [71]
 Id. at 154, 97 S.Ct. at 1736-37 (quoting Cupp v. Naughten, 414 U.S. 141, 147, 94 S.Ct. 396, 400, 38 L.Ed.2d 368 (1973))
 
 
 [72]
 Id. at 155, 97 S.Ct. at 1737
 
 
 [73]
 Id
 
 
 [74]
 764 F.2d 1356 (11th Cir.1985), cert. denied, 474 U.S. 1073, 106 S.Ct. 834, 88 L.Ed.2d 805 (1986)
 
 
 [75]
 Id. at 1364
 
 
 [76]
 Id. (citing Henderson, 431 U.S. at 154-55, 97 S.Ct. at 1736-37)
 
 
 [77]
 Id. (citing Henderson, 431 U.S. at 155, 97 S.Ct. at 1737) (emphasis in original)
 
 
 [78]
 Id. at 1365
 
 
 [79]
 Fair v. State, 245 Ga. 868, 268 S.E.2d 316, 321, cert. denied, 449 U.S. 986, 101 S.Ct. 407, 66 L.Ed.2d 250 (1980)