PUBLISH

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF
APPEALS
ELEVENTH CIRCUIT
JAN 18 2001
THOMAS K. KAHN
CLERK

_____

No. 98-8830

_____

D. C. Docket No. 94-01444-1-CV-ODE

TRACY LEE HOUSEL,

Petitioner-Appellant,

versus

FREDERICK J. HEAD,

Respondent-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(January 18, 2001 )

Before DUBINA, CARNES and COX, Circuit Judges.

COX, Circuit Judge:

Tracy Lee Housel was sentenced to death in Gwinnett County, Georgia, after pleading guilty to the murder of Jean Drew on April 7, 1985. He petitioned the district court for a writ of habeas corpus under 28 U.S.C. § 2254.[1] The district court denied the petition, and Housel appeals.[2] We affirm.

## I. Facts & Procedural History

The evidence at Housel's sentencing described a far-flung violent-crime spree capped off by Drew's murder. Between February and April of 1985, the jury learned, Housel cudgeled a man to death in Texas, in a dispute over cocaine, after anally sodomizing him; repeatedly stabbed a man, pushed him down a roadside embankment, and left him for dead in single-digit weather on the side of an interstate in Iowa; forced a woman to perform oral sex on him in New Jersey; and beat and strangled Drew to death in Georgia, abandoning her mangled and unrecognizable body in a vacant lot on Beaver Ruin Road. The law caught up with Housel in Daytona Beach,

---

[1]     The pre-1996 version of § 2254 governs this petition because it was filed in 1994. *Lindh v. Murphy*, 521 U.S. 320, 327, 117 S. Ct. 2059, 2063 (1997).

[2]     The district court granted Housel a certificate of probable cause to appeal (CPC). That was then the proper way in this circuit to permit an appeal on a § 2254 proceeding begun before AEDPA's effective date. *See Franklin v. Hightower*, 215 F.3d 1196, 1196 (11th Cir. 2000). But the Supreme Court has since decided that a certificate of appealability (COA) under AEDPA-amended 28 U.S.C. § 2253(c), rather than a CPC, is required for all appeals taken after AEDPA's effective date. *See Slack v. McDaniel*, 120 S. Ct. 1595,1600 (2000). It is within our discretion to issue a COA when the district court has issued only a CPC. *See Peoples v. Haley*, 227 F.3d 1342, 1346 (11th Cir. 2000). We grant a COA covering all the issues that are addressed in this opinion.

Florida, where he had gone after killing Drew, and where he was charging country-western outfits to Drew's credit cards. A search of Drew's car, which Housel was driving, and of Housel himself revealed identification belonging to Drew and to Troy Smith, the Texas victim. Credit card receipts on Housel traced his itinerary from Iowa through the Midwest and down the East Coast to South Carolina with the stolen car and credit cards of Gary Kennedy, the Iowa victim. Only for the New Jersey sexual assault did authorities find no physical evidence. Kennedy and the sexual-assault victim testified, however, to Housel's attacks.

The jury also heard two tape-recorded statements from Housel about three of these crimes. Housel made his first statement the day after his arrest. He confessed to beating and strangling Drew to death after he had picked her up at a truck stop on I-85 northeast of Atlanta. In the same statement, he admitted to stabbing a man in Iowa whom the authorities identified as Kennedy. After this first statement, Housel was transferred to Gwinnett County custody. A few weeks later, Housel made a second statement to Gwinnett County Police Department Detective John Latty, in which Housel admitted to anally sodomizing Troy Smith and then killing him with multiple ball-peen hammer blows to the head.

This evidence of all of these offenses comprised the State's evidence at the sentencing hearing. Housel responded by appealing to the jurors' sense of mercy.

His live-in girlfriend, the mother of his then-three-year-old son, testified that Housel had been a good provider and a caring father. The boy was introduced to the jury and invited to cry out "Hi, Daddy" from the gallery. (Resp't's Ex. 13 at 1811.) (The prosecutor later complained on the record that after this introduction the child began and continued to cry for his father, all within earshot of the jury, as the sentencing hearing progressed.) Housel's mother pleaded for mercy, as did another of Housel's girlfriends. Then Housel himself took the stand and confessed, consistent with his statements, to all these crimes except the sexual assault in New Jersey — he testified that the oral sex was consensual. He spoke of his "normal" upbringing (*id.* at 1883), his "good" relationship with his mother (*id.* at 1835), and the sad disintegration of his relationship with his son's mother because of his work schedule. He ended by telling the jury that he had been baptized a Christian and by pleading for mercy. The jury found beyond a reasonable doubt the statutory aggravating circumstance that the murder was "horrible or inhuman and [*sic*] that it involved depravity of mind and aggravated battery, torture"[3] (Resp't's Ex. 5 at 264) and sentenced Housel to death.

Twice during the sentencing hearing (first in an informal on-the-record discussion and again at the charge conference), the issue arose how the jury should be instructed to treat the evidence of unadjudicated crimes that comprised much of the

---

[3]    Presently codified at O.C.G.A. § 17-10-30(b)(7) (1997).

State's case. Housel argued that under Georgia law "the court has to submit those other transactions" to the jury "on the basis of some standard of proof." (Resp't's Ex. 13 at 1931.) He proposed an instruction that would have fixed the threshold standard of proof at beyond a reasonable doubt and prohibited the jury from considering Housel's confessions to the unadjudicated crimes for any purpose absent such a beyond-a-reasonable-doubt finding. The trial court rejected the proposed instruction and permitted the jury to consider all the evidence of the other offenses as nonstatutory aggravating evidence.

On appeal to the Georgia Supreme Court, Housel challenged this ruling — as an error of Georgia, not federal constitutional, law — and also argued that the trial court should have suppressed his uncounseled confession to Troy Smith's murder. The Georgia Supreme Court rejected both arguments. *Housel v. State*, 355 S.E.2d 651 (Ga. 1987). The U.S. Supreme Court denied certiorari. Housel then petitioned the Butts County Superior Court for a writ of habeas corpus, grounded in part on a claim that his counsel did not pursue a constitutionally adequate investigation into his mental health, drug abuse history, and abusive upbringing. The superior court denied the petition after a hearing, and the Georgia Supreme Court denied a certificate of probable cause to appeal.

Housel then filed this petition under 28 U.S.C. § 2254. His claims included ones that (1) his counsel was constitutionally ineffective for failing to develop and present evidence of intoxication, drug abuse, brain damage, hypoglycemia, and an abusive upbringing; (2) the trial court should have required a threshold jury finding that Housel committed the unadjudicated crimes before it could consider them as nonstatutory aggravators; and (3) his uncounseled confession to Troy Smith's murder was involuntary. The district court held an evidentiary hearing and received affidavits[4]. It then denied relief in a detailed and thorough opinion.

## II. Issues on Appeal and Standards of Review

On appeal, Housel challenges the district court's rejection of these three claims.[5] We review the district court's findings of historical fact for clear error only, reserving de novo review for its holdings of law and its application of law to the facts.

---

[4] Some of Housel's evidence was not offered in the state-court hearing, and thus ordinarily should not be considered in the federal courts. *See Williams v. Head*, 185 F.3d 1223, 1226 (11th Cir. 1999), *cert. denied*, 120 S. Ct. 2696 (2000). But the district court concluded that, because of certain rulings of the state habeas court, Housel qualified for the cause-and-prejudice exception to the general bar on new evidence. *See id.* The State does not challenge this ruling on appeal.

[5] The State has not raised any procedural-bar arguments in this court (although it did in the district court), and we neither address nor decide whether any of the claims Housel now presses have been defaulted under state procedural rules. *See Trest v. Cain*, 522 U.S. 87, 89, 118 S. Ct. 478, 479 (1997) (court of appeals has discretion not to invoke procedural bars sua sponte).

6

*Freund v. Butterworth*, 165 F.3d 839, 861 (11th Cir. 1999) (en banc), *cert. denied*, 528 U.S. 817, 120 S. Ct. 57 (1999).

### III. Discussion

### A. Ineffective Assistance of Counsel

Housel claims that he received ineffective assistance of counsel at sentencing (or at the guilt/innocence phase, in the case of intoxication evidence) because his counsel failed to develop and present the evidence that collateral counsel would later gather: testimony from Housel's relatives and childhood acquaintances in Rhode Island that Housel grew up in a poor, abusive, and otherwise dysfunctional family; expert testimony that Housel suffers unspecified residual behavioral effects from childhood head injuries; expert testimony that Housel is susceptible to hypoglycemic episodes of extreme irritability; and evidence that Housel was drunk at the time of the crime and had a long history of substance abuse. We agree with the district court that Housel has not shown himself entitled to relief on this claim.

A Sixth Amendment violation occurs when counsel's performance falls below constitutional standards and the deficient performance sufficiently prejudices the defense. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984); *accord*, *Williams v. Taylor*, 120 S. Ct. 1495, 1511 (2000). A failure to investigate can be deficient performance in a capital case when counsel totally fails to inquire into the

defendant's past or present behavior or life history. *See, e.g., id.* at 1514 (deficient performance; counsel failed to return a phone call to prison minister offering mitigating testimony about defendant's prison behavior, never inquired into the defendant's background, and did not check the defendant's exemplary prison record); *Agan v. Singletary*, 12 F.3d 1012, 1018 (11th Cir. 1994) (second counsel let petitioner plead guilty without getting first counsel's file, which would have disclosed investigator's suspicions that petitioner was covering for the real murderer, and despite petitioner's irrational behavior before investigators and the grand jury, counsel sought no mental evaluation); *Cave v. Singletary*, 971 F.2d 1513, 1519 (11th Cir. 1992) (counsel was so confident about acquittal that she did not prepare at all for penalty phase); *Horton v. Zant*, 941 F.2d 1449, 1462 (11th Cir. 1991) (counsel performed no investigation and presented no evidence in mitigation), or when counsel ignores "red flags" that any reasonable attorney would perceive as demanding further investigation, *see Cunningham v. Zant*, 928 F.2d 1006, 1018 (11th Cir. 1991) (counsel, knowing of petitioner's near-fatal head injury in a car accident, failed to seek an expert assessment of possible resulting mitigating evidence). But a failure to investigate is not a unique category of counsel omission that automatically satisfies *Strickland*'s deficient-performance prong; rather, like all counsel conduct, it enjoys a presumption of reasonableness that the petitioner must rebut to prevail. *Chandler*

8

*v. United States*, 218 F.3d 1305, 1314 (11th Cir. 2000) (en banc). For that reason, even when trial counsel's investigation is less complete than collateral counsel's, trial counsel has not performed deficiently when a reasonable lawyer could have decided, in the circumstances, not to investigate. *See id.* at 1318. Under these principles, we consider the three categories of evidence that Housel contends his counsel failed to develop and present to the jury in mitigation, or (in the case of the intoxication evidence) to discover as a defense to the charge.

*Upbringing evidence.* Britt was not unconstitutionally ineffective in failing to present the testimony of the witnesses to Housel's childhood and adolescence, for two reasons. First, Britt's investigation itself was not deficient under the circumstances. Britt asked Housel to prepare a life history to help with the investigation. Absent a strategic choice to pursue this kind of life-story mitigation — a choice that Britt did not make — Britt could reasonably rely on Housel's representations to him as to matters of Housel's personal knowledge. *See Chandler*, 218 F.3d at 1318. Britt followed up on Housel's life history and contacted every person whose name Housel gave him. That investigation turned up Housel's mother, of course, who testified — consistent, incidentally, with Housel's own testimony — that Housel's upbringing was normal. Britt reasonably could decide, once he was told by both Housel and his mother that there was nothing traumatic in Housel's background, to go no further.

There is no indication here that any of the miseries of Housel's upbringing made it into the public record, as they did in *Williams v. Taylor*, 120 S. Ct. at 1514 (parents jailed for criminal neglect of petitioner), or that Britt had any reason to know about them.

Second, abandoning one defense in favor of another that counsel reasonably perceives to be more meritorious is not deficient performance, even if it means that the jury does not hear certain kinds of mitigation evidence. *Chandler*, 218 F.3d at 1320-21. Britt could reasonably decide, given the heinousness of this crime and Housel's confession to it, that in the cultural climate of Gwinnett County in the 1980s, remorse was likely to play better than excuses. *Cf. Tompkins v. Moore*, 193 F.3d 1327, 1337 (11th Cir. 1999) (observing that evidence of childhood environment is weak mitigating evidence, at best, for a crime committed by an adult), *cert. denied*, 121 S. Ct. 149 (2000). The district court found, based on Britt's testimony at the federal hearing, that it was indeed Britt's strategic decision to accept responsibility, "humanize" Housel, show that he had a family, and ask for mercy. The record shows that Britt took steps to do just that. Housel testified candidly, admitting his crimes, and made no excuses.[6] Britt's questions to Housel's mother did not dwell on Housel's

---

[6] Q  . . . [D]id you have a normal you [sic] upbringing with the mother and father both living at home bringing up you and your brothers?
A  A normal upbringing, yes, sir.
Q  All right. So you're not telling this jury that the way your mother and dad

10

childhood, noting only that Housel's relationship with his father was "good," but that his father became preoccupied with fraternal organizations like the Knights of Columbus during Housel's adolescence. (Resp't's Ex. 13 at 1793.) She finished by pleading with the jury to "[b]e lenient with him. Don't give him the death penalty because if you do you're killing two people. I lost my husband, and if he dies I I [*sic*] do, too." (*Id.* at 1798.) Britt capped off the remorse-and-mercy strategy with the well-timed introduction of Housel's son to the jury. Mitigation is a culturally variable notion, and Britt's relying on intuition, born of courtroom experience, about a jury's behavior was not unconstitutionally deficient performance.

*Intoxication and mental health evidence.* The reasons why we reject Housel's ineffective-assistance-of-counsel claim on the upbringing evidence apply equally to evidence of Housel's intoxication on the night of Drew's murder and to the evidence of brain damage and hypoglycemia. First, as the district court found, Britt knew enough about Housel's mental health reasonably to conclude that further investigation would not bear fruit. Housel said nothing to Britt about hypoglycemic episodes, and the record gives us no reason to believe that hypoglycemia was on the "ask about" list

---

brought you up and the fact that your father died with when [*sic*] you were 18 is any reason for you to go around killing people and attacking people, is it?

A       There is no reason why anybody should kill anybody.
(Resp't's Ex. 13 at 1883.)

11

of all reasonable lawyers in 1985. And even though Britt knew that Housel had suffered a head injury in an automobile accident, Britt observed nothing unusual about Housel's behavior, and indeed testified that Housel was one of his most intelligent clients. Britt had before him, moreover, two psychological evaluations, neither of which offered any encouragement to proceed further. In these circumstances, Britt's decision not to expend finite resources developing psychological evidence in mitigation or defense was not unreasonable. *Cf. Baldwin v. Johnson*, 152 F.3d 1304, 1314 (11th Cir. 1998) (decision not to pursue psychological testing reasonable when petitioner appeared normal to counsel), *cert. denied*, 526 U.S. 1047, 119 S. Ct. 1350 (1999); *Stephens v. Kemp*, 846 F.2d 642, 653 (11th Cir. 1988) (counsel could reasonably stop investigation after one unfavorable psychiatric evaluation).

Second, Britt could reasonably have decided to avoid using evidence of Housel's intoxication on the night of the offense and his history of substance abuse. Evidence of drug and alcohol abuse is "a two-edged sword," *Tompkins*, 193 F.3d at 1338, and a lawyer may reasonably decide that it could hurt as much as help the defense. *Cf. Waldrop v. Jones*, 77 F.3d 1308, 1313 (11th Cir. 1996) (observing that "excessive alcohol and drug use" is not "evidence in mitigation"). That is in fact what Britt decided to do here, based on his experienced judgment that Gwinnett County jurors did not consider alcohol and drug use to be mitigating. Britt explained that he

12

thought he would maximize his chances of a life sentence if he did everything he could to show a family-friendly side of Housel, rather than dwelling on the evidence of Housel's extensive drug use and drinking with a sociopathic biker crowd. And once again, the record bears out Britt's testimony about his choice of strategy: the witnesses called in mitigation were Housel's son and the women who knew Housel's domestic side. This was a reasonable choice.

Britt's reluctance to rely on intoxication evidence is no more impeachable at the guilt/innocence stage of the proceedings, when Housel accuses Britt of deficiently failing to raise an intoxication defense. In exchange for the guilty plea, the State dropped a potentially highly prejudicial charge against Housel for the sexual assault of Drew. Britt could reasonably have gauged as small the chances of success on an intoxication defense on these facts before a Gwinnett County jury, both because Housel's post-murder behavior was not entirely consistent with uncontrollable intoxication and because of the jury's possible disapproval of drunkenness. Britt could then reasonably have elected to forgo an intoxication defense for the benefit of keeping the rape charge under wraps. *Cf. Rogers v. Zant*, 13 F.3d 384, 387-88 (11th Cir. 1994) (when there is a tactical reason for forgoing an intoxication defense — such as maintaining credibility in the jury's eyes — counsel is not ineffective for doing so). The record again bears out that this was actually Britt's choice. He moved in limine

13

to capitalize on the guilty plea by excluding all mention of rape at trial, and he did not dwell on Housel's intoxication, which could have squandered any credit he gained in the jury's eyes by not relying on intoxication as a defense or excuse. This choice, like all the others that Britt made, was reasonable and does not represent deficient performance.

Because Housel did not show that his counsel's performance was deficient, the district court properly denied Housel relief on these claims.

## B. Unadjudicated Crimes

Housel next argues that the Eighth Amendment's requirement of reliability in death sentencing forbade the jury from weighing his unadjudicated crimes in Iowa, New Jersey, and Texas as nonstatutory aggravators until the jury had found, beyond a reasonable doubt, that he had committed the offenses. Like the district court, we reject this argument, although for a different reason.

Housel's argument is not novel. But it has never been accepted in any form by a majority of this court or the Supreme Court. *See, e.g.*, *Williams v. Lynaugh*, 484 U.S. 935, 937-38, 108 S. Ct. 311, 313 (1987) (Marshall, J., dissenting from denial of certiorari, addressing use of unadjudicated-crimes evidence in support of a statutory aggravating factor); *Devier v. Zant*, 3 F.3d 1445, 1467 (11th Cir. 1993) (Kravitch, J., specially concurring) (arguing for the adoption of Housel's proposed constitutional

14

rule); *see also Milton v. Procunier*, 744 F.2d 1091, 1097 (5th Cir. 1984) (rejecting the argument that admission of evidence of unadjudicated crimes at sentencing violates an unspecified constitutional right).

Perhaps since last a court visited the question Eighth Amendment jurisprudence has evolved to recognize the right that Housel espouses. But we need not reach the merits of the question in this case. New rules of constitutional law are not a proper ground for relief in collateral proceedings. *Lambrix v. Singletary*, 520 U.S. 518, 527-28, 117 S. Ct. 1517, 1525 (1997). This nonretroactivity rule, born in *Teague v. Lane*, 489 U.S. 288, 109 S. Ct. 1060 (1989), is a threshold issue, *Lambrix*, 520 U.S. at 524, 117 S. Ct. at 1523, and one that we have discretion to raise sua sponte, *see Caspari v. Bohlen*, 510 U.S. 383, 389, 114 S. Ct. 948, 953 (1994) ("[A] federal court may, but need not, decline to apply *Teague* if the State does not argue it."). The interests of comity— especially here, where Housel did not offer his present constitutional arguments to the trial court or the Georgia Supreme Court — persuade us to exercise that discretion.

To determine if a rule is new, *Teague* requires us to "survey the legal landscape," as of the date that Housel's conviction became final, to determine whether the relevant constitutional rule (here, one requiring a threshold jury finding of "guilt" of unadjudicated crimes before the jury considers them in death sentencing) "was

15

*dictated* by then-existing precedent — whether, that is, the unlawfulness of [Housel's] conviction was apparent to all reasonable jurists." *Lambrix*, 520 U.S. at 527-28, 117 S. Ct. at 1525 (emphasis in original). Housel's conviction became final on August 25, 1988, when the U.S. Supreme Court declined to rehear its denial of Housel's petition for certiorari to review the affirmance of his conviction. At that time, and even years later, the legal landscape was barren of all but the most general support for the rule Housel urges. General principles do not dictate rules. *See Gray v. Netherland*, 518 U.S. 152, 169, 116 S. Ct. 2074, 2084 (1996) (rejecting the dissent's argument that a general right of due process — a meaningful opportunity to explain or deny evidence — dictated a rule that defendant be apprized of exactly the evidence that the prosecution would offer). Justices Marshall and Brennan's 1987 dissent in *Williams v. Lynaugh*, which contended that the Eighth Amendment prohibits the introduction of unadjudicated-crimes evidence altogether in capital sentencing, could cite no more specific authority for their arguments than the plurality opinion's statement in *Woodson v. North Carolina*, 428 U.S. 280, 305, 96 S. Ct. 2978, 2991 (1976), that because death is different, "there is a corresponding difference in the need for reliability in the determination that death is an appropriate punishment." *Williams*,

16

484 U.S. at 938, 108 S. Ct. at 313 (Marshall, J., dissenting from denial of certiorari).[7]

Six years later, well after the finality of Housel's conviction, Judge Kravitch of this court looked to similarly broad principles to justify an Eighth Amendment right to a threshold finding, at a death sentencing, of beyond-a-reasonable-doubt guilt on unadjudicated crimes used as future-dangerousness evidence. Judge Kravitch believed that such an instruction would balance the need for reliability articulated in *Woodson* with the state's "important interest" in presenting "all relevant evidence regarding the defendant's character." *Devier*, 3 F.3d at 1467 (Kravitch, J., specially concurring). But the rule she cogently supported was suggested, not dictated, by the precedent she cited. Nor is Housel's proposed rule, and we therefore conclude that it would be new.

Housel maintains, nonetheless, that the new rule he proposes falls within *Teague*'s exception for "watershed rules of criminal procedure." *Saffle v. Parks*, 494 U.S. 484, 495, 110 S. Ct. 1257, 1264 (1990). The Supreme Court has emphasized the narrowness of this exception and held up *Gideon v. Wainwright*'s[8] right to counsel as a benchmark of the advance in fairness and accuracy that a watershed rule must have.

---

[7]     Justice Marshall also felt the need to urge the Court to overrule *Williams v. New York*, 337 U.S. 241, 69 S. Ct. 1079 (1949), the decision in which the Court rejected 7-2 a due-process challenge to a judge's reliance, at death sentencing, on unadjudicated-crimes information developed in a presentence investigation by a probation officer.

[8]     372 U.S. 335, 83 S. Ct. 792 (1963).

*See id.* Housel's rule would, perhaps, promote some marginal reliability in death sentencing. But it is only marginal; the jury would still hear potentially prejudicial evidence of unadjudicated crimes, tempered only by a requirement of an intermediate finding of "guilt" midway through the process before they weighed those crimes in the balance. The slight rigor conferred by this intermediate finding is not enough to give the rule the "primacy and centrality" of *Gideon*. *Id*. We thus think that the exception does not apply.

Because Housel's proposed rule is new, and does not qualify for an exception to the nonretroactivity doctrine, that doctrine bars relief. The district court thus properly denied relief on this claim, as well.

## C. Use of Involuntary Confession

Housel challenges the use against him at sentencing of his confession to the murder of Troy Smith. The uncontradicted evidence at Housel's sentencing told this story about the statement: Housel volunteered to Detective Latty that he wanted to talk when Housel learned that Orange County, Texas investigators (from where Troy Smith died) had come to Gwinnett to look at Housel's tattoos. Detective Latty refused to take a statement immediately, insisting that Housel reinitiate contact. Housel did so soon afterward by calling Latty. Latty picked Housel up at the jail and took him to the police station, where Latty informed Housel of his rights and reminded Housel

18

that Britt had been appointed to represent him. Housel declined to have Britt there, calling him a "sawed-off sonofabitch." (Resp't's Ex. 12 at 1726.) Latty nonetheless tried to reach Britt at home, but he was not there, and Housel then proceeded to make a statement after signing a waiver of his rights and restating the waiver on tape.

The district court determined, and Housel does not contest, that Housel's challenge to the use of this statement at sentencing arises under the Fifth Amendment's right to due process, rather than the Sixth Amendment right to counsel. The Fifth Amendment's Due Process Clause requires that confessions be voluntary under the totality of the circumstances. *Arizona v. Fulminante*, 499 U.S. 279, 287, 111 S. Ct. 1246, 1252 (1991); *Baldwin v. Johnson*, 152 F.3d 1304, 1320-21 (11th Cir. 1998); *Waldrop v. Jones*, 77 F.3d 1308, 1316 (11th Cir. 1996). Voluntariness is as much a legal notion as a factual one, perhaps because part of the inquiry is whether law enforcement has "overreach[ed]," and our review of the state court's conclusion (and the district court's) is thus de novo. *Id.*; *see Fulminante*, 499 U.S. at 287, 111 S. Ct. at 1252; *Baldwin*, 152 F.3d at 1320.

Housel has supplemented the uncontested trial story of his confession with three circumstances that, he argues, rendered involuntary his call to Detective Latty to

confess.[9] Housel first accuses Latty of setting out to obtain a confession from the time that Latty brought Housel back to Georgia. The district court so found, but like the district court we think that this circumstance alone does not require suppression of the confession. Rather, Latty must have done something impermissible to extract the confession, and wanting information from a suspect is not impermissible. Housel seems to admit as much, because his second and third circumstances are, respectively, the stick and the carrot that Housel blames Latty for using to reach his goal.

First, the stick: Housel points to the unusually bad treatment he received in the Gwinnett County Jail. He was held in solitary confinement, shocked with a stun gun, and denied a shower for three months, all of which caused him to behave bizarrely during his confinement. The weakness in these contentions is, as the district court found, that Housel does not have competent evidence to link them to the statement about Smith's murder. The testimony to jail conditions was supplied by a sheriff's deputy who started to work there *after* Housel had confessed. None of the affidavits — which come from other inmates at the Jail — offered as evidence of Housel's treatment, furthermore, is pinned down sufficiently in time to know if the terrible circumstances predate the confession. The affidavits do not, furthermore, explain how

---

[9] No one has suggested that any of the evidence first offered in federal proceedings is not properly considered, and we therefore treat all the evidence as having been properly before the district court and us.

20

the affiants have personal knowledge of how Housel was treated in solitary confinement.

The carrot circumstance has no better support from the district court's findings of historical fact. Housel says that Latty schemed to get a statement by responding to Housel's calls and complaints about the jail, letting Housel out of his cell to talk, and offering little bribes of Burger King Whoppers and cigarettes. But again, the importance of this circumstance is undermined because the connection of this treatment to the statement is weak. The district court found that Latty had spoken to Housel only three times between Housel's arrest and the statement. The district court found, moreover, that Latty never promised Housel anything in exchange for a statement, which makes us doubt that Latty's favorable treatment was out of bounds in any event. It would certainly be anomalous for us to hold that a law enforcement officer may not be nice to a detainee at risk of suppression of any statement the detainee made.

We thus agree with the district court that these circumstances do not overshadow the facts suggesting voluntariness, which are that Housel initiated the contact with Latty and "unequivocally waived his right to have Britt present." (R.7-76 at 53.) The district court therefore properly rejected this claim, too.

## IV. Conclusion

21

For the foregoing reasons, we affirm the district court's denial of relief.

AFFIRMED.